## CURTIS RODGERS V. THE STATE.

No. 20438. Delivered May 24, 1939.
On Motion to Reinstate Appeal June 21, 1939.
Rehearing Denied October 11, 1939.

The opinion states the case.

*Floyd Jones* and *L. D. Hawkins,* both of Breckenridge, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, Judge.

The offense is receiving and concealing stolen property; the punishment, confinement in the penitentiary for five years.

The caption fails to show the date of adjournment of the trial court. Under the decisions of this court, the appeal must be dismissed. Holder v. State, 18 S. W. (2d) 661.

The appeal is dismissed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

ON MOTION TO REINSTATE APPEAL.

CHRISTIAN, Judge.

The record having been perfected, the appeal is reinstated and the case considered on its merits.

On the 26th day of September, 1937, someone stole some nitroglycerine, dynamite and "booster" bombs from Bert Smith. According to the testimony of Mr. Smith, the property had a value of far in excess of fifty dollars. Shortly after the theft the stolen property was found in a pasture in Young County and identified by the owner. Mr. Miller, Credit Manager of Independent Eastern Torpedo Company, testified that he employed Dick Toliver in an effort to locate the property, which was thought at the time to have been concealed in Young County. He delivered $200 to Mr. Wolf and accompanied him and other officers to Young County. We quote from the testimony of the witness Miller as follows:

"I went with Captain Hamm of the Highway Patrol, Mr. Wolf, the ranger, and Mr. Freeland, the sheriff, and I believe, Bert Smith, the owner. We did see Dick Toliver on that trip. We met him at the bridge at the Brazos River. We saw Dick Toliver the first time that night at the bridge up between here and Graham at the Brazos River. * * * After we met Dick Toliver at the bridge we went on to Graham. Mr. Wolf and the ranger went out to where the glycerine was. I knew where

it was. Sheriff Freeland, Captain Hamm and myself stayed at Graham. We stopped in front of the Graham National Bank. We were in my car. We had the car parked there. That was at nighttime. I think it was around 10 o'clock at night. Shortly after Dick Toliver and Mr. Wolf left us Mr. Wolf came back. He was in company with the defendant, Curtis Rodgers. As to who was in the car with them, I think Mr. Rodgers' wife and a man named Walker were in the car with them. Their car was parked on the other side of the street from us, about thirty feet from us, at the curb. I saw some transaction between the ranger, Mr. Wolf, and the defendant. Mr. Wolf was paying him (referring to appellant) this two hundred dollars that I had given him. At that time the officers arrested him. I went to where the glycerine was located that night. Mr. Wolf guided us out there. We found out there this nitroglycerine and dynamite and solidified. We did identify that as the property of the Independent Eastern Torpedo Company. We identified it as that which Mr. Smith had lost."

Charles Wolf, who worked for the Department of Public Safety, testified to having had a conversation with appellant relative to buying the stolen nitroglycerine and dynamite from him. We quote from his testimony, in part, as follows: "Mr. Toliver and a man named Walker and Slim (referring to appellant) and I went out to where it was. We went to a pasture about five miles out of Graham. Slim Rodgers drove the car out there. We talked with reference to the purchase or sale of some property. I talked with Slim Rodgers. I asked him about the nitroglycerine he had out there and how much he had and about selling it. He wanted two hundred dollars for it. I tried to argue with him about the price. He said that was what they had to get for it and that he couldn't take any less. He did take me out to where it was. I looked it over. We just sat there and talked about the price of it and I agreed to pay him the money for it, and I told him to come on and let's get back to town. Mr. Toliver didn't know where it was until Slim Rodgers told me. * * * We came on back to Graham and there was a square there. We went around the corner and stopped at a cafe about three doors down from the bank. I saw the officers' car parked there. They were parked on the corner the other way from where we were parked. * * * After we first parked the car I asked Slim if he wanted to get a cup of coffee. I told him that I would pay him for the stuff and would give him the money. I started to pull my purse out and hand him the money and Mrs. Rodgers said something to me. She said 'There is Mr. Redwine,' (referring to an officer). He

was walking over from the corner and down the sidewalk. * * * Slim didn't say anything. She just said, 'Put the money down for a minute.' After that I started to pull the money out again. She said, 'There is a whole bunch of officers.' She said 'There comes a whole bunch of officers.' She told me to put the money back in my pocket. I put the money back in my pocket. The officers then came on up and arrested Slim Rodgers and Walker."

After his arrest appellant made a confession which reads, in part, as follows:

"On Sunday night, September 26, 1937, I was in the domino hall at Graham and John McMurtry came in there and called me out behind the domino hall and had a conversation with me. He said that there was some powder—that's what he called it but it was dynamite—out there at his chicken house, and that he wanted me to haul it off and set it out somewhere, and he said he would sell it and split fifty-fifty with me. I told him I didn't know nothing about it and never did handle none of it, and he said it was at his place and him and his wife was scared to have it there, afraid it would go off or something, and that he wanted it moved. He always treated me all right, and he asked me if I would move it and I told him I would. He also mentioned about this glycerine. He said it was about half a mile back behind his house, at first, in the woods. He said there was some cans of stuff down there and that he didn't know what it was but that he believed it was glycerine, and I said I didn't know nothing about that at all. Then he said, 'Well, is there anyone in there that knows anything about it?' and I says, 'I don't know.' Frank Walker was playing my hand while I was talking to John McMurtry, and I said I would ask Frank if he knew what glycerine was and if he knew how to handle it, and I went in and called him off and asked him if he knew what it was, and he said he did. I asked him if he had ever handled any, and he said he had worked around wells with it, and I told him that John McMurtry wanted some moved, that he was afraid it would go off and blow his house off, and we went and moved it. We moved it in three loads. I don't believe John McMurtry helped to move any of it. He was there at the chicken house and had an electric light, but I couldn't tell you whether he carried out any or not. John McMurtry said there was some man stole it from East Texas and just brought it and put it off on him. Something was said that night about paying me $1.50 a quart for it. John McMurtry said it was brought there for L. A. Long. John McMurtry said he would see to it himself about selling it,

and would split fifty-fifty. He said he was going to see Tige Frogge and see if he could sell it to him.

"Me and Frank Walker took the glycerine about five miles north of Graham. John McMurtry lives right close to the beer joint out towards there, and it was about 2 1/2 or 3 miles north of his house that we took the glycerine. We put some sacks around the glycerine when we moved it; Frank Walker said that was the way to move it. We covered it over with weeds and the sacks that night.

"I was back out there yesterday. Me and my wife went out to get a jag of wood. John McMurtry saw me several times after we put the glycerine out there about selling it. He was down at the house yesterday morning and wanted me to go out and see if it was still out there. He had brought a purchaser down there—a big fellow. He called me right out beside the car with the big fellow sitting in the car, and he says, 'Now you make out like I don't know nothing about this and he can leave the money with me.' If the big fellow had been listening, he could have heard John McMurtry say that. John McMurtry told this big fellow to leave the money with him that night. John said, 'Make out like it is yours,' when he was talking to me. We drove out just about a block the other side of my house, and we sat there and talked and they drank their gin. This man saw me last night. John McMurtry saw me yesterday morning. John McMurtry told me that a fellow by the name of Smith brought the stuff over there in a Buick sedan. He said he was supposed to sell it to L. A. Long; said that was what it was brought over there for. I went out there last night in my car with this man and with Mr. Wolf, and my wife was along, and Mr. Walker. I showed Mr. Wolf right where I hauled the dynamite, and we came back to town and he had his money out ready to pay me when I was arrested. I had told Frank Walker if I got anything out of it I would split the money fifty-fifty with him.

"John McMurtry told me that the fellow who brought it over there got scared and left.

"There is one more box, painted red and marked 'danger,' that the officers did not get last night when they got the other glycerine and dynamite. This box has been broken into and the top taken off, but we took it out there from John McMurtry's.

"I was convicted in Duncan, Oklahoma, in 1925 for car theft, and was sent to the Reformatory and served until 1928. I went to the penitentiary from Young County, Texas, in 1931, for possession of whisky for the purpose of sale."

Appellant did not testify and introduced no witnesses who gave testimony controverting either his confession or the testimony of the witnesses for the State.

The indictment embraced averments to the effect that prior to the present case appellant had on two different occasions been convicted of felonies less than capital. The question as to whether appellant had been previously cenvicted, as alleged, was submitted in the charge of the court. The verdict of the jury embraced no finding that appellant had been previously convicted of the other felonies, the sole finding being that he was guilty of the offense of receiving and concealing stolen property. The penalty assessed was five years confinement in the penitentiary. If the jury had found against him as to the previous convictions the penalty assessed would have been imprisonment in the penitentiary for life. See Art. 63, P. C. We mention these matters in view of appellant's bill of exception No. 1, which complains of certain proof made by the State as to the law of Oklahoma. We deem it unnecessary to determine whether the bill reflects error, as the matter brought therein pertains solely to the question of a previous conviction for a felony in the State of Oklahoma which had been alleged in the indictment for the purpose of enhancing the penalty. The jury having failed to find that appellant had been previously convicted, it follows that if the proof mentioned was erroneously received it cannot be said to have prejudicially affected the appellant. See Trimmers v. State, 136 Texas Crim. Rep. 450, 125 S. W. (2d) 299. Hence reversible error is not presented. In this connection it might be added that appellant's confession was received in evidence without objection. It has been observed that it embraced a statement to the effect that appellant had been previously convicted in Oklahoma of theft of an automobile and had also been convicted in Texas for the possession of whisky for the purpose of sale. The offenses mentioned in the confession appear to have been those set forth in the indictment for the purpose of enhancing the penalty.

Bill of exception No. 2 refers to appellant's objection to the testimony of Charlie Wolf that he had given the sheriff certain instructions relative to recovering the stolen property. If this testimony should not have been received, we would not reverse the judgment in view of the uncontroverted proof in the record that appellant knowingly received the stolen property.

Bills of exception Nos. 3 and 4 deal with testimony of a

character similar to that set forth in bill No. 2, and we pretermit discussion of same.

We have carefully examined the charge of the court in the light of appellant's exceptions, and are constrained to the view that the exceptions were not well taken.

The judgment is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

GRAVES, Judge.

There is no matter submitted to this court, in the motion for rehearing, that was not noticed in the original opinion. We remain of the same views as expressed therein.

The motion for rehearing is overruled.